UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF ALABAMA

In re                                                         Case No. 07-11273-WRS
                                                              Chapter 7
RUBY SWILLING,

      Debtor

RUBY SWILLING,

      Plaintiff                                   Adv. Pro. No. 08-1016-WRS

  v.

ACA FINANCIAL SERVICES INC.,

      Defendant

## MEMORANDUM DECISION

This Adversary Proceeding came before the Court for trial on October 2, 2008. Plaintiff Ruby Swilling appeared in court in person and by counsel Gary W. Stout and David G. Poston. ACA Financial was in court by its President Tony Ellison and by counsel Russell N. Parrish. For the reasons set forth below, judgment will be entered in favor of Plaintiff Ruby Swilling in the amount of $15,000, consisting of $5,000 in actual damages and $10,000 in punitive damages, plus costs and attorney's fees to be awarded by subsequent order of this Court.

### I. Facts

The Plaintiff Ruby Swilling, seeks damages from Defendant ACA Financial alleging a willful violation of the automatic stay. Swilling lives in Dothan, Alabama, with one minor child and has an adult daughter who lives nearby who provides financial support and day to day

1

Case 08-01016    Doc 25    Filed 11/20/08    Entered 11/20/08 16:02:43    Desc Main
              Document      Page 1 of 18

assistance. Swilling's sole income is approximately $1,200 per month from Social Security. (Case No. 07-11273, Doc. 1, Sch. I). She is disabled as a result of a mental illness.

Defendant ACA Financial is in the business of making consumer loans. ACA has three branch offices in southeast Alabama. The main office is in Dothan where its President Tony Ellison maintains an office. The Dothan branch office is managed by Ricky Dixon. Both Ellison and Dixon testified at the October 2, 2008 trial.

On August 11, 2006, Swilling borrowed $300 from ACA on a promissory note.[1] (Pl. Ex. 2). The transaction is striking in that to fully repay the $300 loan, Swilling would have had to repay a total $456.42 within six months after she borrowed the money. The Annual Percentage Rate was an astonishing 61%. ACA's President Tony Ellison testified that the charges and fees on the loan were all lawful.[2]

In conjunction with the loan, Swilling signed documents opening a new bank account at Republic Bank and Trust. An actual check drawn on Republic Bank would be printed at ACA's place of business where, in theory, the check was to be delivered to Swilling. In addition, the direct deposit of Swilling's Social Security check was changed from Swilling's existing account at Five Star Credit Union to the new account at Republic Bank. Republic Bank does not have any branches in Dothan and there was no practical means for Swilling to get the money out of her Republic account, other than by way of going to ACA's Dothan office and getting the check from them.

---

[1] Many of the facts have been established by way of a Stipulation which was filed by the parties in advance of trial. (Doc. 22).

[2] The propriety of the charges is not at issue here and the Court will, for purposes of this decision, assume that the charges are lawful.

2

On August 31, 2006, Currency Connection issued Ruby Swilling a check which she received and cashed at ACA's Dothan office. Swilling made a $60 payment on her loan from ACA and took the rest of the money in cash. Shortly thereafter, Swilling's adult daughter had the disposition of Swilling's Social Security check changed back to her account at Five Star. Swilling did not make any subsequent payments to ACA. ACA's President Tony Ellison testified that borrowers with Republic Bank accounts were not contractually required to make payments on their indebtedness to ACA. Moreover, Ellison testified that Swilling did not breach any covenant in her loan by changing the disposition of her Social Security check.

On September 11, 2007, apparently out of frustration that Swilling was not making payments on her indebtedness, ACA's Dothan Office Manager Ricky Dixon forged a Currency Connection form which resulted in the diversion of Swilling's October 31, 2007 Social Security check to the Republic Bank account. (Pl. Ex. 7). On September 14, 2007, Swilling filed a petition in bankruptcy pursuant to Chapter 13. (Case No. 07-11273). When Swilling did not receive her October 31, 2007 Social Security check, she telephoned ACA several times, in early November, 2007, speaking with both Dixon and ACA's President Tony Ellison. Swilling advised ACA of her bankruptcy filing and demanded her money. Dixon refused to pay over to Swilling her funds unless Swilling first made a payment on her debt. Both Ellison and Dixon testified that the telephone conversations with Swilling were quite acrimonious.

A check drawn on Swilling's Republic Bank account was printed in ACA's office. Ellison testified that he was concerned that the five dollar fee for printing the check would somehow violate the automatic stay. For this reason, according to Ellison, ACA mailed Swilling's check to Republic Bank. Having heard the testimony of Ellison, Dixon and Swilling,

3

Case 08-01016   Doc 25   Filed 11/20/08   Entered 11/20/08 16:02:43   Desc Main
Document      Page 3 of 18

the Court does not accept Ellison's testimony. The Court finds that, contrary to Ellison's testimony, the reason ACA mailed the check to Republic Bank was to take it out of Swilling's reach, in retaliation for Swilling's default on her indebtedness and her uncivil comments made to Ellison. As Swilling had no practical way of obtaining her Social Security payment other than through ACA, which was then blocked, Swilling contacted the Social Security Administration who issued a replacement check, which was received by Swilling on December 15, 2007.

Swilling testified that, as a result of the disruption of her Social Security money, her electricity and telephone services were disconnected. Swilling testified that she had been advised that the Department of Human Resources would take her daughter if she did not have electricity and food in the home. As a result, Swilling testified that she suffered considerable stress and could not eat for four days. With financial assistance from her adult daughter, Swilling had her electricity reconnected after a few days.

ACA contends that it did not receive notice of Swilling's bankruptcy filing because ACA was scheduled using an old address. The Court's record indicates that the "Notice of Commencement of Chapter 13 Bankruptcy Case," was mailed to ACA at 2967 Ross Clark Cir. #2, Dothan, Alabama. (Case No. 07-11273, Doc. 12). Moreover, ACA had not then availed itself of the protection of 11 U.S.C. § 342(f) as of the date of filing.[3] The Court notes that

---

[3] Section 342(f)(1) provides that: "(a)n entity may file with any bankruptcy court a notice of address to be used by all the bankruptcy courts or by particular bankruptcy courts, as so specified by such entity at the time such notice is filed, to provide notice to such entity in all cases under chapters 7 and 13 pending in the courts with respect to which such notice is filed, in which such entity is a creditor."

Tony Ellison testified at trial that ACA has now made such a filing and that they are receiving bankruptcy notices without incident.

4

bankruptcy filing information is available from a number of sources. If ACA had a PACER account, it could have conducted a search of the Bankruptcy Court's records using the internet.[4] Both Dixon and Ellison were skeptical of Swilling's claim that she had filed bankruptcy, but they did not make any effort to check readily available public records.

Having heard the evidence, the Court finds that ACA Financial violated the automatic stay when it failed to honor Swilling's demand for her funds. While the automatic stay was not in effect at the time Dixon forged the Currency Connection document, his refusal to pay over the funds on demand, after the bankruptcy filing, was an act to collect a prepetition indebtedness. Moreover, the violation was willful in that ACA had actual knowledge of the bankruptcy filing not later than November 5, 2007. ACA's act of returning the funds to Republic Bank effectively placed the funds out of Swilling's reach was another willful act in furtherance of the same scheme.

Having found a willful violation of the automatic stay, the Court must next determine the amount of damages. While Swilling recovered her social security funds approximately 45 days after they were taken, the Court is of the view that she suffered substantial damages as a result of emotional distress. The Plaintiff is poor, living solely on social security income and disabled as a result of a mental illness. Her electricity and telephone were cut off, she went four days without eating and she was afraid that the Department of Human Service would take her child from her. While damages resulting from severe emotional distress are difficult to quantify, they are not zero.

---

[4] PACER accounts are free and can be obtained at www.pacer.uscourts.gov. For a small charge, users may view actual court filings online.

Having considered all of the evidence, including the fact that the Debtor is on disability income for mental illness, that the means of her substance was taken, at least for a time, and that she legitimately feared that she might lose her child, the Court finds that damages for emotional distress in the amount of $5,000 is appropriate.

## II.  CONCLUSIONS OF LAW

This Court has jurisdiction to hear this Adversary Proceeding pursuant to 28 U.S.C. § 1334.  This is a core proceeding.  28 U.S.C. § 157(b)(2)(G).

### A.  Violation of the Automatic Stay

The filing of a petition in bankruptcy "operates as a stay . . . of . . . any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title."  11 U.S.C. § 362(a).  Dixon's forgery of the Currency Connection form, in and of itself, did not violate the automatic stay because that action was taken prior to the commencement of Swilling's bankruptcy proceeding.  However, having unlawfully diverted Swilling's Social Security funds and being in possession of property of the bankruptcy estate to which it was not lawfully entitled to keep, ACA was under a duty to turn the funds over to Swilling upon demand.  See, In re Briskey, 258 B.R. 473 (Bankr. M.D. Ala. 2001)(holding that judgment creditor has a duty to return garnished funds after the date of the petition).  By its failure to return the unlawfully diverted funds, ACA violated the automatic stay.  Id., see also, Eskanos & Adler, P.C., v. Leetien, 309 F.3d 1210, 1215 (9th Cir. 2002)(holding that Section

6

362(a)(1) imposes an affirmative duty to discontinue post-petition collection actions); Johnston v. Parker (In re Johnston), 321 B.R. 262, 282 (D. Ariz. 2005)(holding that creditor post-dissolution collection proceedings had an affirmative duty to move to vacate State Court order entered in violation of the automatic stay); Preston v. GMPQ, LLC (In re Preston), __ B.R. __, 2008 WL 4500263 (Bankr. W.D. Mo. October 7, 2008)(finding that creditors act of collecting sequestered funds after filing of bankruptcy petition a violation of the automatic stay); McFarland v. City of Jacksonville (In re McFarland), 2008 WL 4550378 (Bankr. M.D. Fla. July 24, 2008)(Holding that once City learned of bankruptcy filing, it had a duty to undo a judgment recorded in violation of the automatic stay); Spagner v. Latham, Stall, Wagner, Steel & Lehman, P.C., (In re Spagner), 2005 WL 1950364 (Bankr. W.D. Okla. Aug. 15, 2005)(holding that creditor has affirmative obligation to cease garnishment after learning of bankruptcy filing); Johnson v. Precision Auto Sales (In re Johnson), 2007 WL 2274715 (Bankr. N.D. Ala. Aug. 7, 2005)(holding that creditor who repossessed automobile without knowledge of automatic stay was under duty to return vehicle upon learning of bankruptcy filing); Roche v. Pep Boys, Inc., (In re Roche), 361 B.R. 615 (Bankr. N.D. Ga. 2005)(holding that creditor has an affirmative duty to cease garnishment upon hearing of bankruptcy filing); Keen v. Premium Asset Recovery Corp., (In re Keen), 301 B.R. 749, 753 (Bankr. S.D. Fla. 2003)(finding that creditors' nonwillful violation of the automatic stay who moved for default judgment without knowledge of the bankruptcy filing became a willful violation when it did not promptly act to remedy the situation).

    ACA did not willfully violate the automatic stay until it refused to pay over Swilling's funds once it had knowledge of the automatic stay. A violation of the automatic stay is willful if

the Debtor establishes, by a preponderance of the evidence, that the creditors knew of the automatic stay and intended the actions that constituted the violation.  Johnson v. Smith (In re Johnson), 501 F.3d 1163, 1171 (10th Cir. 2007).  Specific intention to violate the automatic stay is not required.  Fleet Mortgage Group, Inc., v. Kaneb, 196 F.3d 265, 269 (1st Cir. 1999).  Swilling's telephone call to Dixon was sufficient to put ACA on notice that a bankruptcy petition had been filed and an automatic stay was in effect.  If Dixon did not believe Swilling's claim, he could have easily checked the public records and verified the filing or simply telephoned the Clerk's office.  Moreover, PACER accounts are free and this Court's records can be checked by anyone with computer access.  This Court has had, for many years, VCIS (Voice Case Information Service) which permits anyone with a telephone to check bankruptcy filings by either the Debtor's name or social security number.[5]   Creditors who are concerned about properly receiving notice of bankruptcy filings may file a notice and provide an address at which it is to receive notices.  11 U.S.C. § 342(f).

ACA made much at trial that it had never received written notice of Swilling's bankruptcy filing until it was served with a complaint.  The Court sent out a "Notice of Chapter 13 Bankruptcy Case," on Official Form 9I on September 15, 2007. (Case No. 07-11273, Doc. 10).  A copy was mailed to ACA at 2967 Ross Clark Cir. #2, Dothan, Alabama 36301.  (Case No. 07-11273, Doc. 12).  ACA President Tony Ellison testified that they had moved their office several years earlier, and that their records did not reflect that they had received the September 15, 2007 Notice.  Swilling offered into evidence a copy of records from the Alabama Secretary of State indicating that ACA's Registered Agent was Tony Ellison at 2967 Ross Clark Cir., Dothan,

---

[5]  This Court's VCIS may be telephoned at 334-954-3868.

Alabama. Therefore, notice of Swilling's bankruptcy filing was sent to ACA's Registered Agent. That ACA had continued to file Annual Reports with the Secretary of State indicating an old address, years after they had moved, does not invalidate the notice. Ala. Code § 10-2B-5.04.[6] Indeed, Alabama law requires corporations to give the Secretary of State notice of change of the address. Ala. Code § 10-2B-5.02. Notice mailed to a Registered Agent is adequate notice for purposes of 11 U.S.C. § 342(a).

### B. Damages

#### 1. Actual Damages

As a result of the diversion of Swilling's social security income, her electricity and telephone service were disconnected, causing her to suffer emotional distress, not to mention the loss of use of her residence for several days. It is well established that damages for emotional distress and mental anguish resulting from a violation of the automatic stay have been allowed by the courts. In a case handed down by the First Circuit, an 85 year-old man was awarded $25,000 in damages for emotional distress because his mortgagee had initiated a foreclosure action in violation of the automatic stay. Fleet Mortgage Group, Inc., v. Kaneb, 196 F.3d 265 (1st Cir. 1999). The mortgagee's lawyer was promptly advised of the bankruptcy filing by the debtor's lawyer, however, he did not dismiss the case for six weeks. As a result, the Debtor suffered

---

[6] Ala. Code § 10-2B-504(a) provides that "(a) corporation's registered agent is the corporation's agent for service of process, notice, or demand required or permitted by law to be served on the corporation."

9

disrupted sleeping and eating patterns and worry. The Court considered the Debtor's advanced age in making its determination.

A Bankruptcy Court in Oregon awarded a debtor damages in the amount of $50,000 for emotional damages as a result of her being jailed for approximately three hours, in violation of the automatic stay. <u>Caldwell v. McMahan's of Lancaster, Inc., (In re Caldwell)</u>, 2006 WL 3541931 (Bankr. D. Or. December 7, 2006). A bench warrant had been issued for the debtor's failure to appear at a debtor's examination in State Court proceedings held prior to the bankruptcy filing. The creditor was given notice of the bankruptcy filing but did take action to have the warrant recalled. <u>Id</u>.

In a similar case handed down by the Bankruptcy Court in the Southern District of Alabama, a debtor's former spouse was found to have violated the automatic stay when she caused the debtor's incarceration for his failure to pay a prepetition indebtedness. <u>Caffey v. Russell (In re Caffey)</u>, 384 B.R. 297 (Bankr. S.D. Ala. 2008). Damages in the amount of $40,000 were awarded, including $5,000 for emotional distress.

This Court has, on previous occasions awarded damages for emotional distress for a willful violation of the automatic stay. See, <u>Smith v. Homes Today, Inc., (In re Smith)</u>, 296 B.R. 46 (Bankr. M.D. Ala. 2003)(awarding damages for willful violation of automatic stay as a result of a mobile home repossessed and driven off with debtor still in home, a total of $58,183.91 awarded); <u>In re Hildreth</u>, 357 B.R. 650 (Bankr. M.D. Ala. 2006)(awarding $9,000 in actual damages and $18,000 in punitive damages for repeated and abusive telephone calls from mortgagee).

Damages for emotional distress resulting from violations of the automatic stay have been awarded by a number of courts. United States v. Holden, 258 B.R. 323 (D. Vermont 2000)(affirming Bankruptcy Court's award of $7,000 to debtor for mental anguish resulting from Internal Revenue Service offset of tax refund in violation of automatic stay); Curtis v. LaSalle Nat'l Bank (In re Curtis), 322 B.R. 470 (Bankr. D. Mass. 2005)(awarding $15,000 in compensatory, $30,000 in punitive damages and cancelling underlying indebtedness for repeated letters demanding payment on mortgage, violating the automatic stay and discharge injunction); In re McLaughlin, 2007 B.R. 3229166 (Bankr. D. Arizona October 30, 2007)(awarding $7,000 for emotional distress resulting from abusive telephone calls from creditor).

The Court is mindful that claims for emotional distress are difficult to substantiate. As there is no physical injury or property damage, such claims are easy to manufacture. See, Aiello v. Providan Fin. Corp., 239 F.3d 876, 880 (7th Cir. 2001)(denying class certification for plaintiffs who had received letter from credit card lender demanding reaffirmation and threatening to charge fraud if she refused); see also, In re Hodge, 367 B.R. 843, 847 (Bankr. M.D. Ala. 2007)(awarding damages for attorney's fees upon finding willful violation of the automatic stay, but refusing to award damages for emotional distress as a result creditor's threat to prosecute, finding that the emotional distress was fleeting). In this case, the Debtor's emotional distress is accompanied by an actual financial injury, i.e. the deprivation of her Social Security income for 45 days and the attendant consequences, such as the disconnection of utility and telephone services. The Court is of the view that damages in the amount of $5,000 for emotional distress for the Defendant's willful violation of the automatic stay is appropriate.

11

2. Attorney's Fees

Having found a willful violation of the automatic stay and having made an award $5,000 for actual damages, costs and attorney's fees shall also be awarded. 11 U.S.C. § 362(k). The Court will retain jurisdiction over this proceeding to determine the amount of such an award. By way of a separate order, the Court will require Plaintiff's counsel to file an affidavit in support of their claim for attorney's fees and will provide the Defendant with an opportunity to make objections.

3. Punitive Damages

The Bankruptcy Code provides for an award of punitive damages for a willful violation of the automatic stay in "appropriate circumstances." 11 U.S.C. § 362(k). In general, courts look for egregious or malicious conduct. In re Roche, 361 B.R. 615, 622 (Bankr. N.D. Ga. 2005). The Court in Roche, identified five factors which it found appropriate: (1) the nature of the defendant's conduct, (2) the nature and extend of the harm to the plaintiff, (3) the defendant's ability to pay; (4) the motive of the defendant; and (5) any provocation by the debtor. Id. (citing In re Wagner, 74 B.R. 898, 950 (Bankr. E.D. Pa. 1987); Heghmann v. Indorf (in re Heghmann), 316 B.R. 395, 405-06 (1st Cir. BAP 2004); Keen v. Premium Asset Recovery Corp. (In re Keen), 301 B.R. 749, 755 (Bankr. S.D. Fla. 2003); Bishop v. U.S. Bank/Firstar Bank, N.A. (In re Bishop), 296 B.R. 890, 898 (Bankr. S.D. Ga. 2003); see also, In re Johnson, 2007 WL 2274715 (Bankr. N.D. Ala. August 7, 2007)(awarding debtor $1,100 in actual damages and punitive damages in the amount of $5,500, for the wrongful repossession of an automobile and the failure to return it for more than one month).

### a. The nature of the conduct

This case is unusual in that the act which set in motion the harm caused the Debtor was a criminal act committed by the Branch Manager of consumer lender.[7] While Defendant ACA Financial is not a bank in the strict meaning of the word, it is a financial institution and its managers are expected to comport themselves with a level of rectitude higher than other kinds of business establishments. Most stay violation cases involve acts which, but for the imposition of the automatic stay, are otherwise lawful. Eg. Johnson, 2007 WL 2274715 (automobile repossession carried out under circumstances which the Court found egregious). The stay violation here is particularly egregious in that the bank documents were forged and a Social Security check diverted. To be sure, Swilling ultimately got her money back, a fact which would mitigate any criminal sentence. Nevertheless, the violation of a criminal statute, under the circumstances here, is an act of such egregiousness so as to warrant substantial punitive damages.

### b. The nature and extent of the harm to the plaintiff

If one factors out the individual situation of the Plaintiff, and considers only the deprivation of $600 for 45 days, the damages here are not overwhelming. However, when we consider the Plaintiff's situation, that she suffers from mental illness and that she is desperately poor, the harm to the Plaintiff takes on another dimension. ACA cannot and indeed does not

---

[7] By forging the "Currency Connection" form and diverting Swilling's Social Security check, it appears that Dixon committed a bank fraud within the meaning of 18 U.S.C. § 1344. In the alternative, he may have committed a wire fraud within the meaning of 18 U.S.C. § 1343. Both crimes are felonies which carry a maximum fine of $1,000,000 and maximum term of imprisonment of 30 years.

13

argue that it was not aware of her financial situation. They had taken a financial statement from her prior to lending her $300. They knew that Social Security income was her sole source of income and that she had no other means by which to live. Given the Plaintiff's personal situation, the nature and extent of harm was considerable and foreseeable by the Defendant.

### c.  The Defendant's ability to pay

The Parties did not present much evidence as to the Defendant's financial situation. They did not submit financial statements or other information from which ACA's financial conduction could have been determined. Nevertheless, the Court has some evidence on this question. The Defendant here is not a large institutional lender. Rather, it has only three offices, with its main office is in Dothan. It can safely be said that this Defendant does not have the same ability to pay as large institutional lenders or even a large regional lender.

### d.  Motives of the Defendant

The motives of the Defendant in this case were to collect the indebtedness owed by Swilling. While this, in and of itself is not improper, the means used by the Defendant were unlawful. The actions of the Defendant indicate a lack of respect for the law and the rights of others of such a seriousness so as to make an award of punitive damages appropriate. Moreover, the act of sending the check to Republic Bank, rather than to Swilling, appears to have been vindictive and motivated out of spite, probably resulting out of Dixon's and Ellison's bruised feelings arising from rough language used by Swilling, when she rightfully demanded the return

of her funds. When one wrongfully converts, even temporarily, the means of sustenance of another, one may expect that indelicate language may be used.

### e. Provocation by Debtor

The Defendant argues that Swilling provoked this dispute citing several facts. First, the bankruptcy notice was not sent to ACA's correct address. Swilling, or her counsel, could have obtained the address in any number of ways. It is possible, though doubtful, that Swilling's counsel obtained the address from the Secretary of State, which then reflected the old address. More likely, her counsel had an old address which it used in prior cases. The notice problem could have been obviated by Debtor's counsel. The Court is mindful that claims for emotional distress and difficult to substantiate. As there is no physical injury or property damage, such claims are easy to manufacture. See, Aiello v. Providan Fin. Corp., 239 F.3d 876, 880 (7th Cir. 2001)(denying class certification for plaintiffs who had received letter from credit card lender demanding reaffirmation and threatening to charge fraud if she refused); see also, In re Hodge, 367 B.R. 843, 847 (Bankr. M.D. Ala. 2007)(awarding damages for attorney's fees upon finding willful violation of the automatic stay, but refusing to award damages for emotional distress as a result creditor's threat to prosecute).

Further provocation is cited by ACA in Plaintiff's Exhibit 8, which is a written transcript of a telephone conversation between Swilling and Dixon which took place on November 5, 2007. At that time, Swilling told Dixon of her bankruptcy filing and demanded return of her money. Dixon advised that he would be sending the check back to Republic. Swilling telephoned ACA from her lawyer's office using tape recorder. ACA argues that if they had been mailed or faxed

15

copies of the bankruptcy papers, they would have acted differently. ACA states that it receives notices from the Bankruptcy Court on a regular basis and that it has never violated the automatic stay before. However, ACA's claim that the failure to receive written notice was a contributing factor is undercut by its explanation for its reason for mailing the check to Republic Bank, rather than to Swilling. ACA argued that it was fearful that the deduction of the transaction fee would be a violation of the automatic stay, undercut their claim that they did not have notice of the bankruptcy proceedings.[8]

While not a perfect defense, the Court is not unsympathetic to ACA's position. At least some of the blame must be placed on Swilling and her counsel for not scheduling ACA with its current address. Having failed to properly list ACA's address, Swilling's counsel could easily have sent or faxed notice to ACA, giving it the written documentation it so craved. While ACA's defense is insufficient as a matter of law, it should be considered in mitigation of the damages.

### f. Calculation of Punitive Damages

Three facts stand out indicating that this is a case which is appropriate for an award of punitive damages. First, the Defendant not only willfully violated the automatic stay, it committed a criminal act. Second, the Debtor was an unusually vulnerable individual being both poor and mentally ill. Third, because of the Debtor's poverty, the temporary diversion of the Social Security funds resulted in a serious disruption of the Debtor's life. Against this, the Court

---

[8] The automatic stay prohibits actions taken to collect prepetition debts. It does not have any effect upon lawful transaction charges. Assume that a debtor drives on a toll road to the Section 341 meeting of creditors and then parks in a parking lot. The imposition of toll and parking charges would in no way violate the automatic stay.

Case 08-01016   Doc 25   Filed 11/20/08   Entered 11/20/08 16:02:43   Desc Main
Document      Page 16 of 18

would balance the relatively small size of the Defendant, that is, as lenders go, ACA is small. In addition, the Court will consider the provocation by the Debtor and her counsel. As set forth in more detail above, ACA could, and should, have been given better notice of the bankruptcy proceedings. As a final matter, the Court notes that the actual financial damages were small. ACA did not permanently convert Swilling's funds, rather, they put her funds out of her reach for a time. Thus, interest on $600 for 45 days is not a large sum. If consequential financial damages are also considered, the reconnection charges for electric and telephone services are also not large amounts, indeed, Swilling did not present evidence of the specific amounts at trial. Having previously determined that an award of $5,000 for actual damages is appropriate, the Court will award an additional $10,000 in punitive damages.

### III.  CONCLUSION

Defendant ACA willfully violated the automatic stay when it failed to promptly return Swilling's Social Security funds upon demand, after her bankruptcy filing. ACA had actual knowledge of the bankruptcy filing when Swilling telephoned them making inquiry as to her money. Moreover, legally sufficient notice was given ACA, within the meaning of 11 U.S.C. § 342(a), as Notice of Commencement of Bankruptcy Case was mailed to its Registered Agent at the address filed with the Alabama Secretary of State. An award of damages for emotional distress is appropriate here given the Debtor's mental and financial condition and an award of punitive damages is appropriate given the criminal conduct of ACA's Branch Manager. The Court will, by way of a separate order, require Swilling's lawyers to file a written application of

17

Case 08-01016    Doc 25    Filed 11/20/08    Entered 11/20/08 16:02:43    Desc Main
Document      Page 17 of 18

attorney's fees.  Judgment will be entered by way of a separate document after the Court considers the amount of the attorney's fees to be awarded.

Done this 20th day of November, 2008.

/s/ William R. Sawyer
United States Bankruptcy Judge

c:  Gary W. Stout, Attorney for Plaintiff
    Russell N. Parrish, Attorney for Defendant